IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| AUTOLIV ASP, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No: 2:13-cv-141-MHT-WC |
| ) | |
| HYUNDAI MOBIS CO., LTD. and ) | |
| MOBIS ALABAMA, L.L.C., ) | |
| ) | |
| Defendants. ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the court on the parties' opening, responsive, and supplemental claim construction briefs. *See* Docs. 37, 38, 45, 46, 94, and 95. The District Judge has referred this matter to the undersigned United States Magistrate Judge "for consideration and disposition or recommendation, as may be appropriate, on all pretrial matters, including discovery, the *Markman* matter, and dispositive motions." Doc. 27. On May 6, 2014, the undersigned held a *Markman* hearing, and, on October 19, 2017, a supplemental *Markman* hearing. *See* Docs. 49, 100. The issue of claim construction in this patent infringement suit is now ripe for recommendation to the District Judge. For the reasons that follow, the undersigned RECOMMENDS that the court resolve the parties' lone remaining dispute concerning the construction of claim terms by concluding that no construction of the disputed term, "terminal end," is required at this time, and that the term

should therefore be afforded its ordinary and customary meaning in adjudicating Plaintiff's infringement suit.[1]

I.   BACKGROUND

Plaintiff Autoliv ASP, Inc. filed this patent infringement action against Defendants Hyundai MOBIS Co., Ltd., and MOBIS Alabama, LLC on March 4, 2013. *See* Doc. 1. Plaintiff, a developer of technologies "related to automobile safety restraint systems, including inflatable automotive airbags[,]" alleged in the Complaint that Defendants infringed on two separate patents owned by it, U.S. Pat. No. 7,347,450 ("the 450 Patent") and U.S. Pat. No. 7,614,653 ("the 653 Patent"), both of which relate to technological designs of automotive airbag systems intended to reduce injuries to out-of-position vehicle occupants affected by airbag deployments. In particular, the Complaint alleged that Defendants "made, used, offered to sell, sold, and/or imported into the United States airbags that infringe the claims of [its patents] including, but not limited to, at least the Safety Vent airbag found in the 2012 Hyundai Elantra, and continues to do so, all without authority from the patent holder." Doc. 1 at ¶¶ 13, 21. According to the Complaint, as it relates to the 450 Patent, Defendants' allegedly infringing airbags "have safety vents formed by cinch tubes with apertures controlled by cinch cords configured so that, when [the] airbag is obstructed, the cinch tubes remain open, but when the airbag is unobstructed,

---

[1] By design, this Recommendation addresses only the parties' lone remaining dispute about the construction of claim terms and does not recommend a construction of claim terms that, while not disputed by the parties, may require construction. The undersigned anticipates issuance of a comprehensive order on claim construction once the parties' dispute is finally resolved by the District Judge.

the terminal ends of the cinch tubes enter the interior of the airbag and the apertures close." *Id.* at ¶ 13.  Furthermore, as it relates to the 653 Patent, Defendants' allegedly infringing airbags "have a safety mechanism involving a cord connected to at least one closeable vent that is configured to close upon deployment without obstruction[,]" and the "closeable vent is configured to stay at least partially open when the airbag deploys with obstruction."  *Id.* at ¶ 21.  On September 13, 2013, Defendants filed their Answer and Counterclaims (Doc. 20) denying any infringement on Plaintiff's patents and countersuing for a declaration that it has not so infringed and that Plaintiff's patents are invalid.  Plaintiff filed its Answer (Doc. 25) to Defendants' counterclaims on October 4, 2013.

The parties filed their Joint Claim Construction and Prehearing Statement (Doc. 34) on February 21, 2014.  In that document, the parties detailed their dispute regarding construction of several terms in the claims of the 450 and 653 patents, as well as their agreed-upon construction of two terms in claim 20 of the 450 patent.  *See* Doc. 34-1.  On March 21, 2014, the parties filed their Opening Claim Construction Briefs.  *See* Docs. 37, 38.  In its opening brief, Plaintiff argued that all of the disputed claim terms, save "cinch tube(s)," should be given their plain and ordinary meaning.  Doc. 37 at 12-38.  Defendants, on the other hand, offered proposed constructions of all eight of the disputed claim terms across the 450 and 653 patents.  Doc. 38 at 7-24.  On April 22, 2014, the parties filed their Responsive Claim Construction Briefs.  Docs. 45, 46.

After the court held the *Markman* hearing on May 6, 2014, Defendants filed, on July 8, 2014, a Motion to Stay this matter pending *inter partes* review of the subject patents by the Patent Trial and Appeal Board ("PTAB").  Doc. 53.  On July 29, 2014, the undersigned

3

entered an Order (Doc. 62) granting Defendants' motion for stay. On July 21, 2017, after completion of *inter partes* review by the PTAB and appellate review by the Federal Circuit Court of Appeals, in which the patentability of all relevant claims of the 450 patent was affirmed, the undersigned entered an Order (Doc. 89) lifting the stay and directing the parties to file supplemental claim construction briefs. Defendants filed their supplemental brief (Doc. 94) on August 11, 2017, while Plaintiff filed its supplemental brief (Doc. 95) on August 28, 2017. As recounted in the supplemental briefs, after *inter partes* review and further discussions, there remains only one claim construction dispute from the parties' original dispute. *See* Doc. 94 at 1-3. Defendants now contend that the term "terminal end(s)," which appears in several claims in the 450 patent, "represents a fundamental disagreement about the scope of the asserted claims of the 450 patent," and therefore requires construction. *Id.* at 3. Defendants also propose a construction of "terminal end(s)." *Id.* at 4. Plaintiff, on the other hand, maintains that "terminal end(s)" should be given its plain and ordinary meaning. Doc. 95 at 7-16. On October 19, 2017, the undersigned held the supplemental *Markman* hearing at which the parties presented further argument regarding their positions on the lone remaining disputed claim term.

## II.   LEGAL STANDARD

Plaintiff alleges infringement of two of its patents. Before the court may take up the issue of infringement, the meaning of the words used in the claims of the subject patents must be determined. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 374 (1996). As such, the first step in adjudicating an infringement dispute is claim construction. *See Union Oil Co. of Cal. v. Atl. Richfield Co.*, 208 F.3d 989, 995 (Fed. Cir. 2000). Claim

construction is a question of law to be decided by the court. *Markman*, 517 U.S. at 390. Importantly, construction of claim terms is required only when the "parties present a fundamental dispute regarding the scope of a claim term[.]" *O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). However, "a court need not attempt the impossible task of resolving all questions of meaning with absolute, univocal finality." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016). That is, "'a sound claim construction need not always purge every shred of ambiguity.'" *Id.* (quoting *Accumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007)). Moreover, because claim construction is concerned only with the scope of the claims, the court "should not resolve questions that do not go to claim scope, but instead go to infringement[,]" under the guise of claim construction. *Id.* (citing *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs, Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010)).

Where the court is required to construe claim terms, "the interpretation to be given to a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Thus, the court's construction should "stay[] true to the claim language and most naturally align[] with the patent's description of the invention." *Id.* "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention[.]'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim terms should normally be given their "customary and ordinary meaning," which is the "meaning that the term

would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Id.* at 1312-13.  Indeed, a party seeking construction must overcome "a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chem. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood terms." *Phillips*, 415 F.3d at 1314 (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).  However, "determining the ordinary and customary meaning of the claim" often "requires examination of terms that have a particular meaning in a field of art.  Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically," the court first considers the publicly-available intrinsic evidence of the scope of the invention.  *Id.* (citation omitted).  In order of importance as intrinsic evidence, the court considers the claim terms themselves, the patent's specification, and the patent's prosecution history.  *Id.*

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* (citation omitted).  Importantly, the court must consider the context in which the disputed claim terms appear as well as other claims of the patent in determining the ordinary and customary meaning of the claim terms.  *Id.*  Beyond the claim terms, the specification "'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.*

6

at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007). However, courts are instructed not to read into the claim terms limitations from the specification. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). In other words, the specification should be considered "for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what it is." *White v. Dunbar*, 119 U.S. 47, 51 (1886). Finally, if in evidence, the patent's prosecution history should also be considered. *Phillips*, 415 F.3d at 1317. While the "prosecution history provides evidence of how the PTO and the inventor understood the patent[,]" it "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation[.]" *Id.* Thus, "it often lacks the clarity of the specification and this is less useful for claim construction purposes." *Id.*

Apart from the above more significant and reliable sources of intrinsic evidence, the court may look to extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises," to "shed useful light on the relevant art." *Id.* (quotation omitted). However, while useful, extrinsic evidence is viewed "in general as less reliable than the patent and its prosecution history in determining how to read claim terms" because it is not part of the patent, it may not accurately "reflect the understanding of a skilled artisan in the field of the patent," and because, if created for the purposes of litigation, it may be the product of bias. *Id.* at 1318. "In sum, extrinsic evidence may be useful to the

7

court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

### III. DISCUSSION

As noted above, the only remaining claim term under dispute is "terminal end." Defendants submit that this term must be construed because the parties fundamentally dispute "the scope of the asserted claims of the patent." Doc. 94 at 4. In general, "terminal end" describes one end of a "cinch tube" that is a component of Plaintiff's patented airbag invention. The term appears in several claims in the 450 patent. For example, Claim 1 reads as follows:

> 1.  An airbag cushion module, comprising:
> an inflatable airbag cushion defining an interior;
> a cinch tube having a base end opposite from a **terminal end**, wherein the **terminal end** has an aperture; and
> a cinch cord coupled to the **terminal end** of the cinch tube and extending around a majority of the aperture of the **terminal end** of the cinch tube, the cinch cord further coupled to a surface of the airbag cushion such that upon inflatable airbag deployment with obstruction, the cinch cord does not fully extend and the cinch tube remains open, and upon inflatable airbag deployment without obstruction, the cinch cord extends and at least partially closes the aperture at the **terminal end**,
> wherein the cinch tube is configured such that the aperture at the **terminal end** at least partially closes, upon inflatable airbag deployment without obstruction, without necessitating closure of the base end of the cinch tube, and
> wherein the configuration of the cinch tube and the length of the cinch cord enables the aperture to at least partially close, upon inflatable airbag deployment without obstruction, such that the **terminal end** is at least partially within the interior of the inflatable airbag cushion after the aperture becomes at least partially closed.

U.S. Patent No. 7,347,450 col. 5 l. 20-44 (emphasis supplied). The term likewise appears in independent Claim 11 of the 450 patent, wherein it similarly, if in less detail, describes

one end of a cinch tube in an embodiment of the invention having two cinch tubes: "each cinch tube has a base end opposite from a **terminal end**, and each **terminal end** has an aperture[.]" U.S. Patent No. 7,347,450 col. 6 l. 46-47 (emphasis supplied).

Defendants argue that, because "the claims require that some portion of the cinch tube—the 'terminal end' of the cinch tube—be at least partially inside the airbag cushion under certain conditions[,]" construction of "terminal end" is required because, without a construction, Plaintiff may argue that its claim scope includes having some portion of the cinch tube short of the "edge" inside the airbag cushion, while the actual edge of the tube remains entirely outside the airbag cushion. Doc. 94 at 5-6. Thus, Defendants argue, without a construction of "terminal end," "the **jury** is left to decide which parts of the cinch tube may (or must) be 'within the interior of the inflatable airbag cushion after the aperture becomes at least partially closed.'" *Id.* at 6-7 (emphasis in original). To navigate this perceived ambiguity, Defendants propose the following construction of "terminal end:" "the edge of the cinch tube farthest from the airbag cushion." Doc. 38 at 9. Defendants propound this construction because, in their view, "[i]t is only at the end edge of the cinch tube farthest from the airbag cushion" that the cinch tube has the aperture described in the patent claims. *Id.*

In support, Defendants argue that the claims' language describing "a base end opposite from a terminal end" "suggests that the base end and the terminal end correspond to the terminal edges of the cinch tube." Doc. 45 at 18. Defendants also maintain that the drawings in the 450 patent "suggest that the base end and the terminal end of the cinch tube are the terminal edges of the cinch tube." *Id.* at 19. But, apart from their own interpretation

9

of the claims language, which is obviously informed by the infringement arguments Defendants anticipate having to defend, Defendants point to nothing compelling in the intrinsic evidence in support of their proposed construction introducing the "edge" concept. Indeed, they concede that "edge" does not appear in the intrinsic record. Doc. 94 at 7. Nor do they offer a more fulsome explanation of why they believe the claims language confines the "terminal end" of the cinch tube to the "edge" of the tube, despite the lack of any such explicit limitation in the claims themselves or in the specification. Rather, they appear to argue that "terminal end" is inherently ambiguous, and that introducing the concept of the "edge" of the cinch tube will assist the jury in understanding the scope of the asserted claims because "edge" "has a plain meaning that is likely to be used and understood by a juror in a way that 'terminal end' does not[.]" *Id.*

Plaintiff, on the other hand, argues that "terminal end" need not be construed, *i.e.*, that it should be given its plain and ordinary meaning. Plaintiff asserts that there is no evidence in the patent's specification or prosecution history contravening the plain and ordinary meaning of "terminal end" that warrants any construction of the term. Doc. 37 at 19-20. Moreover, Plaintiff maintains that the meaning of "terminal end" is clear in the context of the overall claims language in which it appears. *Id.* at 20; Doc. 95 at 9-10. Plaintiff further argues that Defendants' proposed construction does not clarify the meaning of "terminal end" and improperly excludes the preferred embodiment of Plaintiff's patent. Doc. 95 at 12-15.

After careful consideration of the parties' briefing, the oral arguments presented at both *Markman* hearings, and all submitted materials in the record, the undersigned

concludes that "terminal end" need not be construed at this time and, consequently, should be afforded its plain and ordinary meaning. The undersigned reaches this conclusion, primarily, because the meaning of "terminal end" is sufficiently clear from the overall context of the claims' language and because Defendants' proposed construction would improperly rewrite the claims and exclude the preferred embodiment of the 450 patent.

First, when read in the entire context in which it appears, "terminal end" is sufficiently clear to convey what the inventor intended. For instance, Claim 1 describes a cinch tube with a "base end opposite from a terminal end, wherein the terminal end has an aperture" and is coupled to a cinch cord that extends around the majority of the aperture of the terminal end. This language presents a straightforward description of the claimed design that is oriented around readily discernible features and is easily understood when considered in relation to the drawings disclosed in the patent materials. Furthermore, Defendants have presented nothing tending to show that, collectively, the claims language describing "terminal end" is so ambiguous that a person of ordinary skill in the art would not understand what is claimed. As such, no further construction of the claims language is required. Moreover, the undersigned finds it probative on this point, even if not determinative, that, when confronted with the parties' dispute concerning the patentability of several claims of the 450 patent, including Claim 1, the PTAB declined to construe "terminal end." *See* Doc. 95 at 10. Instead, the PTAB resolved to construe only the claim terms "cinch tube" and "the terminal end is at least partially within the interior of the

inflatable airbag cushion." *See* Doc. 95-1 at 7-9 (*Hyundai MOBIS Co., Ltd. and MOBIS Alabama, LLC v. Autoliv ASP, Inc.,* No. IPR2014-01005 (P.T.A.B. Jan. 6, 2016)).[2]

Even if the subject language presented some ambiguity deserving of further construction, Defendants' proffered construction of "terminal end" is not supported by the claims language or any other intrinsic evidence highlighted by Defendants. As such, it is essentially an attempt to rewrite the claims to achieve a result inconsistent with the claims themselves. Defendants' proffered construction would limit the "terminal end" to the very edge of the cinch tube that is farthest away from the base end. Using an altered version of Figure 4 of the 450 patent, in their supplemental brief, Defendants point to the precise area of the cinch tube that they believe must constitute, in its entirety, the "terminal end," as indicated by the red arrow in the image reproduced below:



---

[2] Notably, in both instances in which it construed terms in the 450 Patent, the PTAB adopted Plaintiff's proposed construction of the disputed terms. *See id.*

Doc. 94 at 6. Figure 4 presents an "alternative embodiment" of the 450 patent wherein the cinch cord is fed through cinch cord loops at the aperture of the cinch tube. U.S. Patent No. 7,347,450 col. 3 l. 18-24. According to Defendants, the edge or "terminal end" is only that portion of the fabric of the cinch cord loop constituting its apex, i.e., where the fabric is creased or otherwise folded to create the loop that will contain the cinch cord.[3] Similarly, in reference to other embodiments of the 450 patent, Defendants maintain that the "terminal end" can only be the "edge" of the cinch tube fabric opposite from the base end. For example, the below images are reproduced from Defendants' responsive claim construction brief:



Doc. 45 at 15. Thus, Defendants contend that, whatever the embodiment depicted in the drawings, it is only this outermost lip or rim of the cinch tube that can constitute the "terminal end."

---

[3] According to the specification, however, the cinch loops depicted in Figure 4 need not be on the "periphery" of the tube as depicted in the picture, as they may also be located "on an inner or outer surface of the cinch tube." U.S. Patent No. 7,347,450 col. 3 l. 20-22.

13

However, according to the claims' description, the "terminal end" is to be "coupled" to a cinch cord that "extend[s] around a majority of the aperture of the terminal end of the cinch tube[.]" U.S. Patent 7,347,450 col. 5 l. 24-26. One struggles to imagine, and Defendants do not explain, how the cinch cord could reliably be "coupled" to the outermost edge of the fabric cinch tube. Certainly, the embodiments of the 450 patent do not appear to indicate any such coupling at the outermost edge. Indeed, even Figure 4 does not depict a cinch cord "coupled" to the "edge" of the cinch tube. Rather, as discussed above, in Figure 4 the "edge" identified by Defendants is merely the crease or fold of the cinch loop through which the cinch cord is fed. Because the claims thus plainly appear to contemplate a "terminal end" consisting of more than just the outermost edge of the cinch tube fabric opposite the base end, Defendants' proposed construction is inconsistent with the claims' language and is therefore due to be rejected. *See, e.g., Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) (quoting *Schoenhaus v. Genesco, Inc.*, 90 F.3d 1354, 1357 (Fed. Cir. 2008)) ("A claim construction that renders asserted claims facially nonsensical 'cannot be correct.'").

Relatedly, Defendants' proposed construction clearly excludes the preferred embodiment of the 450 patent. Plaintiff explains in its supplemental brief that Figure 2A of the 450 patent represents the preferred embodiment of the invention. Doc. 95 at 14-15. Figure 2A plainly depicts a length of cinch tube fabric beyond where the cinch cord is coupled to the "terminal end," as required by Claim 1:

14



Fig. 2A

U.S. Patent No. 7,347,450 fig. 2A. Defendant's proposed construction—that the "terminal end" is only the edge of the cinch tube furthest from the base end—plainly excludes the preferred embodiment because it does not allow the cinch cord to be coupled to any portion of the cinch tube other than the edge of the tube and, therefore, would not allow for any length of cinch tube fabric beyond where the cinch cord is coupled, as is depicted in Figure 2A. As such, Defendant's proposed construction is due to be rejected. *See, e.g., PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) (quoting *Vitronics Corp. v. Conceptotronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)) ("We have often remarked that a construction which excludes the preferred embodiment is 'rarely, if ever correct.'").

    Moving beyond the claims' language, nothing in the specification or the prosecution history that has been submitted in evidence compels the construction proffered by

15

Defendants, or even dictates that additional construction of "terminal end" is necessary. In the Joint Claim Construction and Prehearing Statement, Defendants broadly submit that the intrinsic evidence in support of their proposed construction consists of nearly the entire specification and all of the claims in which "terminal end" appears. Doc. 34-1 at 5. Defendants also submit that three components of the prosecution history support their proposed construction. *Id.* However, in their opening claim construction brief, Defendants do not point to any specific part of the specification or prosecution history as actually supporting the "edge" concept of their proposed construction. Doc. 38 at 9. Likewise, in their responsive claim construction brief, Defendants do not point to any specific portion of the specification or prosecution history of the 450 patent for support of their proposed construction of "terminal end." Doc. 45 at 13-17. Instead, Defendants argue that, because "terminal end" does "not appear anywhere in the '450 patent specification[,]" "Autoliv may rely only on the drawings for the construction of those terms." *Id.* at 13-14. Defendants then proceed to cursorily assert that "[a]ll the figures suggest that the base end and the terminal end of the cinch tube are the terminal edges of the cinch tube." *Id.* However, as set forth above, the figures do not clearly indicate that the "terminal end" is synonymous with "terminal edge," especially when viewed in the context of the claims' language.

 Inasmuch as the drawings do not compel Defendants' proposed construction, neither is it compelled by the fact that "terminal end" does not appear in the specification. Indeed, while Defendants are correct that the specification does not define or include the term "terminal end," the specification also does not speak of the "edge" of the cinch tube and

does not employ an edge concept as a substitute for "terminal end," a fact conceded by Defendants. *See* Doc. 94 at 7. The reason that Defendants do not point to contravening evidence in the specification in support of their construction of "terminal end" is that the specification appears largely consistent with, if less detailed than, the claims in its description of the invention. In relevant part, and specifically describing Plaintiff's preferred embodiment of its invention, the specification speaks of a "cinch cord that is connected at one end to a cinch tube[,]" and that "circumvents a majority of the perimeter of the cinch tube in order to properly tighten and restrict the cinch tube." U.S. Patent No. 7,347,450 col. 2 l. 10-11, 65-67. The specification further explains that, as depicted in Figure 2A, the "cinch cord may be disposed within a sleeve that is formed within the cinch tube." U.S. Patent No. 7,347,450 col. 3 l. 2-4. Thus, while these relevant portions of the specification indeed do not specifically describe the coupling or placement of the cinch cord at the "terminal end" of the cinch tube, neither do they militate against such an understanding of the cinch cord's placement, and the larger understanding of "terminal end," as was later explicated in the amendments of the claims during prosecution.

In sum, the claims define the invention and, in this case, they are not so ambiguous that the claimed invention cannot be discerned. Where neither the claims nor the specification credibly support Defendants' proposed construction and, moreover, the specification does not conflict with the understanding of the terms set forth in the claims, the court need not further construe the claim terms and should instead afford them their customary and ordinary meaning. Accordingly, the undersigned concludes that the court

should adopt the plain and ordinary meaning of "terminal end" for purposes of Plaintiff's prosecution of its infringement suit against Defendants.[4]

## IV. CONCLUSION

For all of the foregoing reasons, the undersigned Magistrate Judge hereby RECOMMENDS that the District Judge reject Defendants' proposed construction of the claim term "terminal end," and, furthermore, adopt the plain and ordinary meaning of the term known to persons of ordinary skill in the art at the time of the invention.

It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **August 24, 2018**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on

---

[4] The undersigned's recommendation regarding claim construction is based upon the record presently before the court and the undersigned's current understanding of the relevant technology. Nothing in this Recommendation should be read to preclude the court's ability to revisit claim construction should additional evidence and understanding of the relevant technology dictate such a result. *See, e.g., Conoco, Inc. v. Energy & Envtl. Intern., L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) (quoting *Guttman, Inc. v. Kopykake Enters, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002)) ("On the other hand, a district court may engage in claim construction during various phases of litigation, not just in a *Markman* order. We have recognized that district courts may engage in 'rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves.'").

appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 10th day of August, 2018.

/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE